# UNITED STATES DISTRICT COURT
# DISTRICT OF SOUTH CAROLINA
# COLUMBIA DIVISION

Lawrence "Coach" Terry,
Plaintiff,

v.

Extra Space Storage Inc. d/b/a Extra Space Storage;
Extra Space Management, Inc.;
ES Operating Partnership, L.P. (to be confirmed in discovery);
Jeffrey "Jeff" Lakevicius, in his individual and official capacities;
Rick Miller, in his individual and official capacities;
John/Jane Does 1–5, corporate personnel who received Plaintiff's April–June 2025 ADA/arbitration emails and refused to act,
Defendants.

Civil Action No. 3:25-cv-13235-JFA-PJG

FIRST AMENDED COMPLAINT
(Federal Question – ADA, 42 U.S.C. § 12181 et seq.; § 504; 42 U.S.C. § 1981; Federal Arbitration Act; Declaratory & Injunctive Relief; Supplemental State-Law Claims)

JURY TRIAL DEMANDED

Plaintiff Lawrence "Coach" Terry ("Plaintiff" or "Mr. Terry"), proceeding pro se, alleges as follows:

## I. INTRODUCTION

1. This lawsuit arises because Defendants knowingly auctioned or permitted the auction and clean-out of

Plaintiff's storage units — units that they knew (a) contained an entire four-bedroom home's worth of property, a custom music studio/business equipment, a custom pool table and accessories, and sensitive family-court and medical records; (b) were the subject of an active, written dispute and arbitration demand; and (c) belonged to a disabled tenant who had been asking since at least January 10, 2024 for ADA-type clarity, written ledgers, and very short, predictable extensions tied to his SSDI pay date.

2. Plaintiff is a Black, disabled male and sudden cardiac arrest survivor who lives with a traumatic brain injury ("TBI") and receives SSDI. Defendants were told this over and over — when he first started renting in or about April 2022, again on January 10, 2024 ("it was a medical emergency… we can work out payment agreements"), again through late 2024 while the then-manager was still willing to "work with" him, and repeatedly in 2025 when he invoked arbitration and asked to deal with corporate instead of the Decker Blvd manager.

3. Beginning in late 2024 — after a new manager, Rick Miller, took over — Defendants stopped honoring those previously provided, low-cost accommodations. Instead, they began: (a) agreeing to an amount (for example "about $350" to stop a December 2024 sale), then (b) adding a new month's rent and unexplained fees so that the balance suddenly jumped to $545.19, and (c) treating every payment as a mere "credit" so that the computer screen always showed "delinquent" and therefore "in auction status."

4. This "credits not payments" practice mattered because it allowed Defendants to say, in their own April 4 and April 14, 2025 emails, that Unit #362 "went into auction status … after 36 days" from the December 1, 2024 due date — not the 60 days required by South Carolina's Self-Service Storage Facility Act, S.C. Code § 39-20-45(C).

5. On April 15, 2025, Plaintiff did exactly what Defendants' own lease says to do: he sent a formal arbitration demand and asked that all three units — #362, #003, and #338 — be included. On April 21, 2025 Extra Space customer service acknowledged it and said it was being forwarded to the local facility. On April 22, 2025, Plaintiff wrote back and said: this cannot be resolved at the local level because it involves (1) state lien-law violations, (2) ADA denials, and (3) misrepresentation of auction eligibility. He asked

for: (a) the name of the arbitration representative, (b) written confirmation that auction would be paused, and (c) confirmation that corporate/legal — not the hostile local manager — was handling it.

6. Defendants never provided an arbitration representative. Instead, on May 13, 2025, the store emailed Plaintiff and said, in substance, "our legal department does not provide arbitration" and then relisted the auction dates for May 27, 2025 (Units #362, #338) and June 10, 2025 (Unit #003) — even though arbitration had already been invoked and even though Plaintiff had disclosed his disability.

7. Plaintiff escalated to District Manager Jeff Lakevicius. Jeff said: send us the paperwork/case number and we can stop the auction. Plaintiff did so. He told them a case had been filed in Richland County (Common Pleas) and, by June 10, 2025, he sent the actual number — 2025CP4003890 — just as they had demanded. By then, Jeff had already told him on May 28, 2025 that "your two units that were in yesterday's auction have been sold, paid for, and cleaned out by the auction buyers." That is textbook bad faith and a direct violation of what they said would stop the auction.

8. Notably, Plaintiff told Jeff on May 28, 2025 that he was in the hospital from the stress caused by the short-notice, changing demands, and ADA denials. Jeff still refused to email the "pay-to-vacate" documents and insisted Plaintiff come in person to the very store/manager that Plaintiff had said was triggering his TBI symptoms.

9. By August 6, 2025 — more than three months after the April 15 arbitration demand and more than two months after they said "send the case number and it will stop" — Plaintiff still had no corporate-level correction. At least two units had already been sold; the third was threatened.

10. Because Defendants had actual, repeated notice of Plaintiff's disabilities since at least January 10, 2024 and still chose to (a) ignore or route his ADA requests back to the offending manager, (b) proceed with auctions before South Carolina's 60-day period, and (c) sell property while a dispute, arbitration, and court case number were all active, their conduct supports federal ADA claims, federal civil-rights claims, and multiple South Carolina common-law claims — and it justifies punitive damages and injunctive relief so that this does not happen again to Plaintiff or other disabled tenants.

## II. JURISDICTION AND VENUE

11. This Court has jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts claims under:

- Title III of the Americans with Disabilities Act, 42 U.S.C. §§ 12181–12189;
- 42 U.S.C. § 12203 (ADA retaliation / interference);
- 42 U.S.C. § 1981 (right to make and enforce contracts without race-based interference or extra burdens);
- The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq. (refusal to participate in contractually invoked dispute resolution).

12. This Court has supplemental jurisdiction over Plaintiff's related South Carolina claims — including breach of contract, breach of implied covenant of good faith and fair dealing, violation of S.C. Code § 39-20-45, constructive fraud, negligent misrepresentation, negligent supervision/retention, and conversion — under 28 U.S.C. § 1367 because they arise from the same nucleus of facts.

13. Venue is proper in this District and Division under 28 U.S.C. § 1391(b) because all material events occurred at the Decker Blvd facility in Richland County, South Carolina, where Plaintiff rented Units #362, #003, and #338.

## III. PARTIES

14. Plaintiff Lawrence "Coach" Terry is an adult resident of Richland County, South Carolina. He is disabled, Black, a TBI survivor, a sudden cardiac-arrest survivor (2018), receives SSDI, and repeatedly requested reasonable disability-related accommodations beginning in or about April 2022 and certainly by January 10, 2024.

15. Defendant Extra Space Storage Inc. is a foreign corporation doing business in South Carolina, operating the self-storage business at 2470 Decker Blvd, Columbia, SC 29206.

16. Defendant Extra Space Management, Inc. is, on information and belief, the management entity responsible for policies, training, collection practices, and escalation of arbitration/ADA issues.

17. Defendant ES Operating Partnership, L.P. (name to be confirmed in discovery) is named to capture the actual titled/operational owner of the Decker Blvd location.

18. Defendant Rick Miller is/was the site manager. He is sued in his individual and official capacities because he personally: (a) sent the lien/auction emails; (b) admitted putting Plaintiff into "auction status" after 36 days; (c) refused to provide the clear written ledger Plaintiff requested; (d) ignored Plaintiff's written disclosure of TBI; and (e) continued to threaten auction even after arbitration was invoked.

19. Defendant Jeffrey ("Jeff") Lakevicius is/was the district manager. He is sued in his individual and official capacities because he personally: (a) received Plaintiff's May 14–29, 2025 escalation emails; (b) told Plaintiff to supply a case number and serve the registered agent to stop the auctions; (c) then admitted the units had already been sold and cleaned out; and (d) refused to email documents even when Plaintiff said he was hospitalized.

20. John/Jane Does 1–5 are corporate personnel who received Plaintiff's April 21–22, 2025 emails that said "this can't be handled locally" but still routed Plaintiff back to the very manager he had complained about.

### IV. FACTUAL ALLEGATIONS

A. Early notice and accommodations (2022–early 2024)

21. When Plaintiff first rented from Extra Space in or about April 2022, he told the then-manager that he had medical limitations, lived on a fixed income, and sometimes needed to pay on or about the 3rd of the month. The manager agreed and honored it.

22. On January 10, 2024, Assistant Manager Holly Evans-Hughes emailed that they "can work out payment agreements" and that she "would like to help you since it was a medical emergency." That is direct, written notice to Extra Space that Plaintiff had a medical emergency and needed accommodation.

23. That January 10, 2024 sequence shows (1) Extra Space knew about the disability; (2) knew Plaintiff was not refusing to pay; and (3) knew that flexible timing + clear communication were the accommodations.

### B. Pattern of "we agree… then we change it" (Nov 2024 – Jan 2025)

24. From November 2024 through January 4, 2025, Plaintiff and Manager Rick Miller repeatedly agreed to a number — roughly $350 — to stop an auction.

   25. Within days, Miller would email and say, in substance: because the due date is the 8th, another month's rent plus an $80 rate increase was added, so now it is $545.19.

   26. On December 19, 2024, Miller even wrote: "My sincere apologies if I was not completely clear with you when we last spoke." That is an admission of lack of clarity — exactly the kind of communication problem Plaintiff was telling them he could not handle because of his TBI.

   27. Despite that, Miller kept changing the number, kept threatening auction, and did not elevate the issue to corporate ADA or legal — even though Plaintiff had already said his support team was "in communication with corporate as this seems to be an ongoing issue."

### C. Unlawful 36-day auction status (Jan – Apr 2025)

28. In multiple April 2025 emails, Miller said Unit #362 "went into auction status … after 36 days from being due on 12/01/2024."

   29. South Carolina law — S.C. Code § 39-20-45(C) — requires 60 days of default before a lien sale.

   30. Plaintiff was also paying in December 2024, January 2025, February 2025, and (apart from March) through April 2025. Miller admitted these showed up as "credits." So there was no 60-day continuous default.

   31. Keeping a disabled tenant in "delinquent/auction" every month despite payments is an unfair, bad-faith practice that especially harms someone whose disability makes it harder to track constantly changing balances.

### D. Arbitration & ADA invoked – April 15–22, 2025

32. On April 15, 2025, Plaintiff sent a formal arbitration demand under the lease dispute-resolution clause. He asked that all three units be reviewed.

   33. On April 21, 2025, Extra Space customer service acknowledged it and said it would be forwarded.

   34. On April 22, 2025, Plaintiff wrote back and said: this

dispute cannot be handled at the local facility because:

- it involves S.C. lien-law violations,
- it involves ADA Title III accommodations,
- it involves misrepresentation of auction eligibility.

35. He gave them a deadline of April 23, 2025 to provide (1) a designated arbitration representative; (2) confirmation of auction pause; and (3) confirmation that corporate/legal, not the local manager, was in charge.

36. That April 22, 2025 email is critical: from that point forward, every Defendant had actual, written notice that (a) Plaintiff was disabled, (b) he was invoking ADA, (c) he had properly invoked arbitration, and (d) he was about to seek injunctive relief.

E. Corporate refusal and unit sales anyway – May–June 2025

37. On May 13, 2025, the Decker Blvd store told Plaintiff: "Extra Space Storage Legal Department does not provide arbitration" and then listed the auction dates (May 27 for #362 and #338, June 10 for #003).

38. On May 14–15, 2025, Plaintiff emailed District Manager Jeff Lakevicius and said: this is already filed in Richland County; I need your legal/arbitration procedures; and referring me back to Rick is inappropriate.

39. On May 20, 2025, Plaintiff sent a Final Arbitration Notice stating clearly that (a) arbitration was demanded and ignored, (b) auction activity had been started only 36 days after default, (c) he had a documented TBI disability, and (d) he was filing for emergency injunctive relief.

40. On May 24–28, 2025, Plaintiff told Jeff he was hospitalized from the stress and could not safely interact with Rick in person. He asked Jeff to email the "pay to vacate" papers. Jeff refused, saying he "will not email the documents."

41. On May 28, 2025, Jeff sent the most damaging email of all: "Your two units that were in yesterday's auction have been sold, paid for, and cleaned out by the auction buyers."

42. Then on June 10, 2025, Plaintiff sent Jeff the case number — 2025CP4003890 — exactly what they said was needed to stop the auction. By then, the damage was done.

F. Continuing harm (June – Aug 6, 2025)

43. By August 6, 2025, Plaintiff still had not received a corporate reversal, a return of property, or even an acknowledgment that selling while (a) arbitration was invoked, (b) an ADA dispute was active, and (c) a case number was supplied — was wrong.

   44. Plaintiff's units contained sensitive personal identifiers (birth certificates, Social Security cards, financial and medical records), family-court documents for an ongoing child-custody matter, and business property. Plaintiff is already an IRS-verified identity-theft victim, so selling/abandoning those documents creates fresh, irreparable harm.

**V. CAUSES OF ACTION**

(Each cause of action is pled in the alternative and against all Defendants unless otherwise stated.)

## COUNT 1 – Violation of Title III of the ADA

(42 U.S.C. §§ 12181–12189; failure to make reasonable modifications; failure to provide effective communication)

   45. Plaintiff incorporates ¶¶ 1–44.
   46. Defendants own, lease, or operate a place of public accommodation (self-storage). 42 U.S.C. § 12181(7).
   47. Plaintiff is a qualified individual with a disability — TBI, cardiac injury, SSDI — and Defendants had actual notice since at least January 10, 2024, and again December 2024–April 2025.
   48. Plaintiff requested reasonable modifications: pay on the 3rd, stable written ledger, email communication (not hostile in-person), pause auctions while disabilities and billing errors were being resolved. None of this would have fundamentally altered Defendants' business.
   49. Defendants refused or rescinded those modifications and, worse, used the resulting confusion to justify saying Plaintiff was "in auction status since January."
   50. That conduct violates 42 U.S.C. § 12182(b)(2)(A)(ii)–(iii) and 28 C.F.R. pt. 36.
   51. Plaintiff is entitled to injunctive and declaratory relief,

policy changes, training, and fees. He also seeks damages via the parallel state-law and § 1981 claims arising from the same conduct.

## COUNT 2 – ADA Retaliation / Interference

(42 U.S.C. § 12203)

52. Plaintiff incorporates ¶¶ 1–51.
53. After Plaintiff asserted ADA rights on April 15, April 22, May 7, May 14–20, and May 28–29, 2025, Defendants:

- re-set auction dates,
- refused to email documents even when he was hospitalized,
- told him units had already been sold and cleaned out.

54. That is adverse action "because" he asserted ADA rights. 42 U.S.C. § 12203.
55. Plaintiff is entitled to all remedies available for ADA interference, including injunctive relief and fees.

## COUNT 3 – Breach of Contract

(against corporate Defendants)

56. Plaintiff incorporates ¶¶ 1–55.
57. Plaintiff and Defendants entered into written rental agreements for Units #362, #003, and #338.
58. Plaintiff performed: he paid repeatedly Dec 2024–Apr 2025, he communicated in good faith, and he formally invoked the dispute/arbitration clause on April 15, 2025.
59. Defendants materially breached by:

- refusing to participate in arbitration after acknowledging the demand;
- proceeding with lien/auction in fewer than 60 days;
- misapplying payments as "credits" to keep the account delinquent;
- selling units after being given the court case number they themselves demanded.

60. Plaintiff suffered more than $80,000 in property loss, plus emotional and medical harm.

## COUNT 4 – Breach of the Implied Covenant of Good Faith and Fair Dealing

(South Carolina common law)

61. Plaintiff incorporates ¶¶ 1–60.

62. Every South Carolina contract carries an implied covenant of good faith.

63. Defendants acted in bad faith by: agreeing to amounts then changing them; refusing to give a clear ledger to a disabled tenant; telling him a case number would stop the auction and then selling anyway; and insisting on in-person appearance before a hostile manager even after a hospitalization.

64. Plaintiff is entitled to contract damages and, because of the willful character of the conduct, punitive damages.

## COUNT 5 – Violation of the South Carolina Self-Service Storage Facility Act

(S.C. Code § 39-20-45)

65. Plaintiff incorporates ¶¶ 1–64.

66. Defendants' own April 2025 emails show they put Unit #362 into auction status 36 days after Dec. 1, 2024.

67. S.C. Code § 39-20-45(C) requires at least 60 days of default before sale.

68. Defendants therefore acted in violation of statute, and the subsequent sale/clean-out is unlawful. All resulting damages are recoverable.

## COUNT 6 – Constructive Fraud / Negligent Misrepresentation

(against all Defendants)

69. Plaintiff incorporates ¶¶ 1–68.

70. Defendants repeatedly told Plaintiff:

   • pay $350 and it will be postponed;
   • when we get your case number/service, auctions will stop;
   • we are "willing to work with you."

71. Plaintiff relied on those statements — even raising funds

from his support system while in the hospital.

72. But Defendants had already said internally that "the auction is valid" and, on May 28, 2025, admitted the units had been sold and cleaned out.

73. Those statements were false or, at minimum, incomplete and misleading. Plaintiff is entitled to damages.

## COUNT 7 – Negligent Supervision and Retention

(against corporate Defendants)

74. Plaintiff incorporates ¶¶ 1–73.

75. By January 2025, corporate/district were on notice of:

- Plaintiff's disability,
- Plaintiff's confusion about "credits,"
- Plaintiff's complaints about Rick Miller's conduct.

76. Instead of removing Miller from the matter and assigning another manager or corporate adjuster, corporate pushed every ADA, arbitration, and billing email back to Miller.

77. That decision foreseeably resulted in the May 27, 2025 auction and the May 28, 2025 "they've been cleaned out" email.

78. Corporate Defendants are liable.

## COUNT 8 – 42 U.S.C. § 1981

(Interference with right to make and enforce contracts)

79. Plaintiff incorporates ¶¶ 1–78.

80. Plaintiff is a Black male attempting to enforce a contract (lease + dispute clause + ADA accommodation).

81. Defendants imposed additional, unnecessary burdens — "must come in person," "will not email," "corporate will not help you" — even when he was hospitalized and even though he had always communicated, paid, and proposed reasonable solutions.

82. Those extra burdens interfered with his § 1981 right to enjoy the benefits of his contracts on the same basis as non-Black and non-disabled tenants.

## COUNT 9 – Conversion / Trespass to Chattels

83. Plaintiff incorporates ¶¶ 1–82.
84. Plaintiff had personal, business, and family-court property in those units — including SSNs, birth certificates, medical files, and business/studio equipment.
85. After written notice of dispute, ADA, arbitration, and a filed Common Pleas case number, Defendants allowed auction buyers to "clean out" at least two units.
86. That is an exercise of dominion inconsistent with Plaintiff's ownership. Plaintiff is entitled to full replacement value and, because of the sensitivity of the documents and his documented, IRS-verified past identity theft, heightened damages.

## VI. PRAYER FOR RELIEF

Plaintiff respectfully asks the Court to enter judgment in his favor and to award:

A. Declaratory relief that Defendants:
   1. violated Title III of the ADA by refusing reasonable modifications and effective communication;
   2. violated S.C. Code § 39-20-45 by initiating auction activity in fewer than 60 days;
   3. breached the lease and the implied covenant of good faith.

B. Injunctive relief ordering Defendants to:
   1. adopt a written policy that any tenant who invokes ADA or dispute/arbitration has all auction activity frozen until a corporate ADA/legal review is completed;
   2. train Decker Blvd and district personnel on ADA interactive-process requirements and on SC's 60-day rule;
   3. refrain from destroying, disposing of, or transferring any remaining property or records tied to Plaintiff's units.

C. Compensatory damages for the loss of: a four-bedroom home of property, custom music studio/business equipment, custom pool table, sports-coaching materials, and all personal/children's/family-court records.

D. Compensatory damages for emotional distress,

hospitalization, neurological flare-ups, and exacerbation of TBI caused by Defendants' conduct.

E. Punitive damages due to Defendants' willful, knowing, repeated refusal to honor ADA, their sale of units after demanding a case number, and their insistence on in-person dealings with a manager Plaintiff had identified as hostile.

F. Costs and fees, including expert fees and, if counsel appears, attorneys' fees under 42 U.S.C. § 12205 and 42 U.S.C. § 1988 (as to § 1981).

G. Trial by jury on all issues so triable.

H. Such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands trial by jury on all issues so triable.

DATED: October 31, 2025
Columbia, South Carolina

Respectfully submitted,

Lawrence Terry
2013 Shelby Drive
Columbia, SC 29223
(803) 414-0760
lawrence_terry1@hotmail.com
Pro Se Plaintiff